UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
NANCY DANNENBERG,

                                           Plaintiff,

                    -against-

UNITED STATES OF AMERICA,

                                           Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**04-CV-4897 (NGG) (JMA)**

------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Nancy Dannenberg brought this action against the United States pursuant to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80. Plaintiff alleged that, on May 22, 2002, employees of the Veterans Administration Hospital in Brooklyn, New York (the "VA Hospital") committed medical malpractice during their evaluation and treatment of her.

      Specifically, Plaintiff claimed that after Doctors Moshe Schmidt and Ann C. McNeal (the "VA physicians") properly diagnosed her as having suffered a transient ischemic attack ("TIA"), they failed to perform a carotid Doppler – a diagnostic evaluation that measures stenosis in an artery – and failed to hospitalize her. (See Trial Transcript ("Tr.") at 3, 7-8.) She further asserted that, were it not for that malpractice, she could have been treated with a drug called tissue plasminogen activator ("TPA") and avoided much of the stroke-related damages that she later suffered. (Id.) The court presided over a bench trial between August 16 and August 27, 2010.

      After reviewing the submissions of the parties, having considered the evidence at trial, and assessing the credibility of the witnesses, the court makes the following findings of fact and

1

conclusions of law as required by Federal Rule of Civil Procedure 52. For the reasons set forth below, the court orders that Plaintiff take nothing of Defendant, and directs the Clerk of Court to enter judgment in favor of Defendant and close this case.

## I. FINDINGS OF FACT

### A. Background and the Events of May 22, 2002

Dannenberg was born in August 1935. (Tr. 134.) On May 22, 2002, she was 66 years old and was employed by the VA Hospital as a clinical social worker. (Id. at 134-35.) She weighed 225 pounds and was 5 feet 5 and a half inches tall. (Joint Pretrial Order (Docket Entry # 55) at 3.) She was diagnosed with high blood pressure, or hypertension, in 2000 and was still suffering from that condition in 2002. (Tr. 136, 180, 188.) Her primary-care physician prescribed a drug called Prinzide for her hypertension, which she was supposed to take once a day. (Id. at 136, 180-81, 188.)

On May 22, 2002, Plaintiff arrived at work around 8:00 a.m. (Id. at 137.) She attended a CPR class and then went to work in the VA Hospital's substance abuse ward. (Id. at 139-40.) Plaintiff noticed that her speech was "garbled" for a short period of time, but then returned to normal. (Id. at 140-41.) She experienced similar problems shortly thereafter in a conversation with a veteran on the ward. (Id.) Plaintiff then went to speak with the psychiatrist in charge of the ward. (Id. at 141.) She again had difficulty with her speech, this time for a slightly longer period. (Id. at 141-42.) The psychiatrist requested a wheelchair and sent Plaintiff to the VA Hospital's emergency room. (Id. at 141-142, 187.)

When Plaintiff arrived at the emergency room, she was no longer garbling her words. (Id. at 191.) She did not have a headache, vomiting, or vision problems. (Id.) Triage nurse Roy

Fiskaa recorded Plaintiff's vital signs in a note made at 12:43 p.m. (Ex. 4 at VA-ER 2.) Plaintiff's blood pressure was 184/101, a level consistent with hypertension. (See Tr. 38-39.)

Dr. Schmidt, an emergency room doctor, reviewed Nurse Fiskaa's note before beginning to evaluate Plaintiff. (Id. at 46.) He suspected that Plaintiff had experienced a TIA. (Id. at 48.) Dr. Schmidt asked Plaintiff about her medical history and symptoms. (Id. at 81-82.) Plaintiff had no complaints other than her earlier speaking difficulties. (Id. at 82.) Dr. Schmidt performed a detailed physical exam and conducted tests designed to rule out certain medical conditions. (Id. at 84-105.) Plaintiff was generally in normal condition, with no evidence of any brain damage. (Id.)

Dr. Schmidt requested a neurological consultation, as was his practice whenever he had concerns about possible damage to a patient's central nervous system. (Id. at 44, 110.) Shortly thereafter, Dr. McNeal, a neurologist, traveled to the emergency room. (Id. at 379.) When she arrived, Dr. Schmidt told Dr. McNeal his impressions of Plaintiff. (Id. at 110-11.) Dr. McNeal stated that it was important that Plaintiff receive an immediate CAT scan. (Id. at 61, 403.) That test was important for assessing whether Plaintiff had a brain hemorrhage or a subdural hematoma that required immediate attention. (Id. at 417.)

Dr. Schmidt and Dr. McNeal also discussed whether it would be appropriate to perform a carotid Doppler examination. (Id. at 110-11, 333.) A carotid Doppler is one of several tests that doctors used in 2002 to evaluate the condition of a patient who appeared to have suffered a TIA. (Id. at 60, 73-74, 111, 404.) A carotid Doppler would have indicated whether there was evidence of significant stenosis in Plaintiff's carotid arteries – a risk factor for stroke. (Id. at 404.) Dr. McNeal believed that Plaintiff needed to receive a carotid Doppler "within one or two days" but that it was not as urgent as a CAT scan. (Id. at 405, 417.) Dr.

McNeal would have preferred to perform a carotid Doppler before Plaintiff was discharged from the VA Hospital, both because of its possible diagnostic value and as a courtesy to Plaintiff's private physician, who would be responsible for performing additional tests. (Id. at 333-35.) Dr. McNeal did not think that it was important that the exam be performed that day, however. (Id. at 410.)

At trial, there were certain discrepancies between Dr. McNeal's and Dr. Schmidt's explanations of why Plaintiff did not receive a carotid Doppler at the VA Hospital. Both doctors believed, however, that it was medically appropriate for Plaintiff's private physician to perform the test shortly after Plaintiff's discharge from the VA Hospital. (Id. at 75, 320, 405, 410.)

After her discussion with Dr. Schmidt, Dr. McNeal interviewed Plaintiff and performed a detailed neurological examination. (Id. at 143, 286, 290, 379, 390-403.) Plaintiff told Dr. McNeal that her speaking difficulties had persisted off and on for about 15 minutes. (Id. at 295, 316.) Despite her earlier speaking difficulties, Plaintiff was generally in stable, normal condition during Dr. McNeal's examination. Dr. McNeal noted that Plaintiff had a history of high blood pressure, which her primary-care doctor was treating with Prinzide. (Id. at 384.) She also noted that Plaintiff had failed to take Prinzide the day before and had taken it later than normal that morning. (Ex. 4 at VA-ER 3; Tr. 43-44.) Ultimately, Dr. McNeal concluded that Plaintiff had experienced a TIA of the left brain hemisphere. (Id. at 326.)

Dr. McNeal told Plaintiff that she should urgently follow up with a private doctor after being discharged from the hospital. (Tr. 365-66.) Plaintiff appeared to understand the importance of doing so. (Id. at 412-13.) At 2:43 p.m., following her conversation with Plaintiff, Dr. McNeal entered a treatment note. (Id. at 364, 413; Ex. 4 at VA-ER 3.) It contained four treatment recommendations: (1) that Plaintiff receive an immediate CAT scan, (2) that Plaintiff

4

receive a carotid Doppler, (3) that Plaintiff resume taking daily aspirin, and (4) that Plaintiff follow up with a private physician within a day or so. (Ex. 4 at VA-ER 3.) Dr. McNeal believed that it was appropriate to discharge Plaintiff that day. (Tr. 320.)

Following Dr. McNeal's consultation, and after reviewing the results of a CAT scan, Dr. Schmidt also concluded that Plaintiff had most likely experienced a TIA on the morning of May 22, 2002. (Id. at 48, 114-15.) Dr. Schmidt was aware that Plaintiff had certain risk factors for stroke, including high cholesterol, hypertension, obesity, aphasia, and weakness. (Id. at 48-55.) Nonetheless, he did not consider her to be at a significantly higher risk of stroke than other TIA patients. (Id. at 54-55.) Dr. Schmidt provided Plaintiff with aspirin and a blood pressure medication. (Ex. 4 at VA-ER 4; Tr. 43, 111.) He told Plaintiff that certain other tests still needed to be performed and that she should contact her private physician as soon as possible. (Tr. 73.) He expected that she would be able to see a doctor by the next morning. (Id. at 74.) Dr. Schmidt did not provide Plaintiff with any instructions in writing. (Id.) Dr. Schmidt discharged Plaintiff at some time before 3:57 p.m. (Id. at 70.) He believed that this was early enough that Plaintiff was likely to be able to reach a primary care physician that day. (Id. at 69-70.)

After Plaintiff left the emergency room, she went back to her office, where she had a phone. (Id. at 144, 198.) She did not call her primary care physician. (Id. at 198.) Plaintiff left the VA Hospital at approximately 4:30 p.m. (Id. at 147.) She got in a driving accident on her way home. (Id.) At trial, Plaintiff testified that she felt "woozie" and had trouble with her vision prior to the accident. (Id. at 148.) Previously, however, Plaintiff had told a treating doctor that her accident was not due to any deficit in her functioning. (Ex. 9 at NYU 8/7 446; Tr. 204.) In

5

any event, Plaintiff testified at trial that she did not experience any problems that persisted for more than a few minutes after the accident. (Tr. 209.)

**B.   May 23, 2002**

In the morning of May 23, 2002, Plaintiff woke and got dressed. (Id. at 212.) She made three personal phone calls, and then called her primary care physician, Dr. Peter Agho. (Id. at 151, 215.) Dr. Agho was booked for the day, but his staff told Plaintiff she could see the doctor as a walk-in. (Id. at 152, 215.) Plaintiff left for Dr. Agho's office in a taxi at sometime around 10:30 or 11:30 a.m. (Id. at 215-16.) It took her approximately half an hour to get there. (Id. at 216.) Plaintiff had not experienced any dizziness, vision, or speech problems that morning. (Id. at 214-16.)

Upon arriving at Dr. Agho's office, Plaintiff checked in with the receptionist and filled out a patient form. (Id. at 216-217; Ex. 6 at JT 30.) She had no difficulty with either task. (Tr. 217.) Plaintiff then waited "a long time" to see Dr. Agho. (Id. at 218.) At some point, while she was waiting, Plaintiff began feeling ill. (Id. at 153.) She described the feeling as "kind of like having the flu." (Id.) She did not feel ill enough to seek attention from Dr. Agho or his staff. (Id. at 218.) She also did not demonstrate any speech difficulties or experience any vision problems. (Id. at 153, 218.)

When Plaintiff finally met with Dr. Agho, her speech was impaired. (Id. at 152, 218.) Plaintiff's speech difficulty lasted "maybe a minute, a couple of seconds." (Id. at 152-153.) Dr. Agho called Plaintiff's son and ordered an ambulance. (Id. at 152, 219.) Before Plaintiff left in the ambulance, she was able to speak normally again. (Id. at 219.) At Plaintiff's request, the ambulance took her to New York University Medical Center ("NYU"), rather than

Roosevelt Hospital, which was closer by. (Id. at 153, 223.) The ambulance personnel did not provide Plaintiff with any treatment. (Id. at 224.)

When the ambulance arrived at NYU, Plaintiff was taken to the emergency room. (Id.) At that point, she was not experiencing any dizziness, vision problems, or speech difficulties. (Id. at 225.) By 3:00 p.m., however, Plaintiff was exhibiting positive expressive aphasia. (Ex. 9 at NYU 8/7 453.) Then, by 3:20 p.m., Plaintiff's speech was again clear. (Id.; Tr. 584.) She was alert, oriented, had good motor strength, and generally was in normal condition. (Ex. 9 at NYU 8/7 453; Tr. 781-86.) At 3:30 p.m., Plaintiff was examined in the emergency room. (Ex. 9 at NYU 8/7 452.) She provided a medical history and complained of expressive aphasia intermittently over the past day. (Ex. 9 at NYU 8/7 452; Tr. 792.)

At 8:11 p.m., NYU performed a CAT scan of Plaintiff's brain. (Ex. 9 at NYU 8/7 536.) The clinical indication noted for the exam was "TIA." (Id.) From 8:50 p.m. to 9:25 p.m., NYU performed diffusion magnetic resonance imaging (an "MRI") of plaintiff's brain, intracranial and extracranial magnetic resonance angiograms ("MRAs"), and an MRA of the carotid arteries in her neck. (Id. at NYU 8/7 531-36.) The clinical history noted for the exams was "TIA, aphasia." (Id. at NYU 8/7 531, 533, 534.) At 9:40 p.m., Plaintiff's speech was clear. (Id. at 8/7 453; Tr. 578.) She was alert and oriented to person, place, and time. (Ex. 9 at NYU 8/7 453, Tr. 578-79.) Her eyes were equally round and her smile was symmetrical. (Ex. 9 at NYU 8/7 453, Tr. 578-79.)

At some point on May 23, 2002, Plaintiff received a neurological examination. (See Ex. 9 at NYU 8/7 457.) The neurological examination results do not indicate the exam time or the author. (Id. at 784, 793.) Plaintiff was awake, alert and oriented. (Ex. 9 at NYU 8/7 457, 776.) Plaintiff underwent a series of neurological tests. (Ex. 9 at NYU 8/7 457.) The author

7

noted abrupt pauses, paraphasic errors, occasional nonsensical neologisms, and that Plaintiff seemed effortful. (Id. at 453; Tr. 777.) Plaintiff's gait exhibited mild swaying and was steady but wide based. (Ex. 9 at NYU 8/7 453.)

Plaintiff's preliminary CAT scan report noted an area of decreased attenuation, "likely representing an acute infarction." (Id. at 536.) The final CAT scan report raised a "question of left frontal lobe infarct," but was otherwise normal. (Id.) The MRI results indicated that plaintiff had physical changes in her brain due to ischemia, reflecting a stroke. (Id. at 795-96.) Plaintiff's intracranial and extracranial MRAs revealed severe stenosis of the left internal carotid artery, normal right carotid and right internal carotid arteries, "multiple acute or subacute left hemisphere subcortical infarcts," and "chronic microvascular changes and chronic lacunes." (Ex. 9 at NYU 8/7 531-33.) The MRA indicated severe stenosis of the left internal carotid artery distal to the common carotid artery bifurcation, with decreased flow in the neck and head. (Id. at 536.)

### C. Plaintiff's Worsening Symptoms

On May 24, 2002, at 9:00 a.m., Plaintiff exhibited expressive aphasia, mild receptive aphasia, mild right facial droop, and mild right drift. (Ex. 9 NYU 8/7 600.) She was alert and oriented to person, but was oriented to place only when presented with choices, and was disoriented to time. (Id. at 600-02) She also exhibited some word searching and expressive aphasia. (Id.) Later that day, Plaintiff received a carotid Doppler exam. (Ex. 16 at NR 25; Ex. 9 at NYU 8/7 537.) Plaintiff's left internal carotid artery showed 16%-49% stenosis. (Ex. 16 at NR 25-26; Tr. 343-44.)

By 10:00 a.m. the next day, May 25, 2002, Plaintiff exhibited "severe limitation of functional speech" and receptive aphasia. (Ex. 9 at NYU 8/7 603.) She was alert to person,

8

place and time, followed commands, and exhibited some word searching. (Id.) Plaintiff was diagnosed with a left hemisphere stroke. (Id. at 467.) Her speech and other symptoms were worsening. (Id.) Consequently, a vascular surgeon performed a left carotid endarterectomy in an effort restore or preserve neurological function. (Id. at 468; Tr. 156.) The surgeon warned Plaintiff that there was a 20%-30% risk associated with having the procedure while having an "evolving left hemispheric stroke." (Ex. 9 at NYU 8/7 468.) When Plaintiff woke in the recovery room after her surgery, she had a global aphasia, right hemiparesis and additional significant symptoms. (Tr. 899.)

### B. Expert Medical Testimony[1]

#### 1) Diagnosis and Treatment of TIAs

In 2002, a TIA was medically defined as a focused neurological deficit, caused by a vascular insufficiency, lasting less than 24 hours. (Id. at 272-74, 319, 372, 456-57.) The medical community recognized that TIA patients faced a significant risk of stroke. (Id. at 313, 499.) Moreover, doctors were aware of several risk factors that could heighten the likelihood of stroke. (Id. at 349-52, 499.) For example, a 2000 article, Short-term Prognosis After Emergency Department Diagnosis of TIA, recognized five independent risk factors for stroke within 90 days of a TIA: "Age older than 60 years, diabetes mellitus, duration of episode greater than ten minutes, and weakness and speech impairment with the episode." (Id. at 347.) But, in 2002, physicians could not quantify an individual patient's risk for stroke based on the presence of those factors, and had no way of weighing individual risk factors and incorporating them into a course of treatment. (Id. at 348, 355, 375, 762-63.)

---

[1] In addition to the two treating physicians at the VA Hospital, medical experts testified at trial on behalf of both Plaintiff and Defendant. The following findings of fact are based on their testimony.

9

Accordingly, there was considerable variation in the medical community regarding the proper evaluation and treatment of TIAs. (See id. at 967.) Nonetheless, there was wide agreement that, when a patient presented with an apparent TIA, it was important to perform a differential diagnosis to rule out conditions other than a TIA. (See id. at 506, 660, 866-67.) Doctors also generally agreed on the importance of prescribing antiplatelet treatments, such as aspirin, and ensuring neurological follow-up once a resolved TIA had been properly diagnosed. (Id. at 615, 814, 875, 890, 972.)

The various experts who testified at trial had different opinions on how prompt such follow-up would need to be. For example, Dr. Christopher I. Doty, one of Defendant's experts, opined that it would be appropriate to perform the follow-up tests within a week. (Id. at 680-81; 688-89.) He based this opinion on his experiences with physicians in his hospital and with academic physicians teaching at hospitals across the country, as well as publications in medical journals. (Id. at 693-94.) Dr. Arthur Rosen, Defendant's other expert, testified that in 2002 most neurologists believed that the other tests should be performed within a day or two of discharge. (Id. at 876.) Plaintiff's expert, Dr. Lawrence Shields, testified that, because a carotid Doppler provided important information, it should have been performed the same day. (Id. at 503-04.)

In May 2002, some patients diagnosed with a resolved TIA were discharged for follow-up tests and others were admitted to the hospital. (Id. at 695-96, 871.) This was also the case for patients with Plaintiff's specific characteristics. For such patients, Dr. Rosen testified that in 2002, the "overwhelming majority of all neurologists" would not recommend hospital admission. (Id. at 877.) Dr. Rosen based this opinion on his own experience, discussions with other neurologists, and his familiarity with medical publications. (Id. at 879.)

10

Dr. Shields, however, opined that the VA physicians diverged from the standard of care by not admitting Plaintiff to the hospital. (Id. at 496, 602.) It was his belief that, in 2002, there was medical research that compelled the conclusion that hospitalization was necessary for all TIA patients. (Id. at 602.) Dr. Shields also identified risk factors that, in his opinion, meant that hospitalization was particularly important for Plaintiff. (Id. at 513, 518-20.) But he admitted that he did not know whether most doctors were following that course for similarly situated patients in 2002. (Id. at 602-03.)

In 1994, the American Heart Association published an article entitled Guidelines for the Management of Transient Ischemic Attacks (the "Guidelines"). (Id. at 408.) The Guidelines noted, among other things, that "there is no routine standard evaluation of patients with TIA" and that "[t]he diagnostic evaluation of patients seen within one week of a TIA should be completed within one week or less" in order to reduce the risk of stroke. (Id. at 408-09, 420, 510, 680-82.) The Guidelines also stated that there was no prospective data relating to the question of whether hospitalization was justified to expedite diagnostic evaluation and treatment of TIA. (Id. at 408, 594-95, 680-82.) An article published in 2000, Short-term Prognosis After Emergency Department Diagnosis of TIA ("Short-term Prognosis"), recognized that medical "[g]uidelines [were] generally vague about the evaluation and treatment of TIAs." (Id. at 374, 517, 590.)

In 1999, the American Heart Association published a supplement to the Guidelines (the "Supplement"). (Id. at 512.) The Supplement did not alter the Guidelines' recommendations regarding the timing of diagnostic evaluation or the need for hospitalization of TIA patients. (See id. at 512, 814.) In 2002, an article entitled Clinical Practice: Transient Ischemic Attack discussed a hypothetical TIA patient: a 72 year-old woman recovering from a 30-minute episode of difficulty speaking and weakness of the right side of the face and right arm. (Id. at 995-96.)

11

That article noted that "there are areas of uncertainty in the treatment of such patients" and recognized that "[t]he benefit of hospitalization for transient ischemic attacks is unknown." (Id. at 996.) Indeed, to this day, no randomized trial has evaluated the benefit of hospitalization. (Id. at 704, 994.)

Several studies also examined the decisions of actual doctors when faced with TIA patients. For example, an article entitled Practice Variability in Management of Transient Ischemic Attacks reported the results of a 1998 survey of 101 neurologists attending an educational conference in San Francisco. (Id. at 715-16, 989.) The survey showed significant variability in their opinions regarding the treatment of TIA patients and the need for hospitalization. (Id. at 715.) Short-term Prognosis also reported the results of an observational study, conducted from 1997 to 1998, at sixteen hospitals in northern California. (Id. at 710.) Among the 1707 patients diagnosed with TIAs, only 14% were admitted to the hospital. (Id. at 375, 591, 712.) But another study, A National Study on Emergency Department Visits for Transient Ischemic Attacks, 1992 to 2001, found that between 1992 and 2001, 68% of patients presenting with TIAs to hospitals in the northeastern United States were admitted. (Id. at 993.) That study also noted, however, that the Guidelines did not address hospitalization and that "[n]o randomized, controlled study has ever shown the benefit of hospitalization for TIA." (Id. at 994.)

        2)      Stroke, Tissue Plasminogen Activator, and Carotid Endarectomies

A stroke is a vascular event that produces a deficit in the brain, retina or spinal cord. (Id. at 446.) In 2002, doctors considered neurological deficits lasting longer than 24 hours to constitute a stroke. (Id. at 372.)

In December of 1995, the National Institute of Neurological Disorders published an article called Tissue Plasminogen Activator for Acute Ischemic Stroke (the NINDS Study"). (Id. at 281, 353, 887-88.) Based on the NINDS Study, the FDA approved the use of TPA for selected patients with acute ischemic stroke treated within three hours from symptom onset. (Id.) The NINDS Study compared two groups of patients, one receiving TPA and one receiving aspirin, for the treatment of acute ischemic strokes. (Id. at 572.) It found an approximately 11%-13% increase in positive outcomes for patients receiving TPA. (Id. at 283, 572, 950-51.)

The NINDS Study also found, however, that patients receiving TPA experienced a 1000% increase in bleeding. (Id. at 573.) TPA has the highest risk profile of any drug that emergency physicians offer patients. (Id. at 651, 666.) Approximately 6.3% of patients receiving TPA experience bleeding, and 2.2% experience serious bleeding, which causes death in 91%-95% of affected patients. (Id. at 571.) There are several types of patients for whom TPA is not appropriate, including patients with mild or resolving symptoms, and patients who recently had a stroke. (Id. at 886.) Although TPA was considered to be medically appropriate for some stroke patients, Defendant's experts testified that it was within the standard of care in 2002 to either use, or not use, TPA to treat stroke. (Id. at 718, 883-84)

A carotid endarterectomy is a surgical procedure that opens up the carotid arteries to remove obstructions that may be causing TIAs or strokes. (Id. at 339, 459.) For patients who have had a TIA or a minor stroke, a carotid endarterectomy is medically indicated if a patient has 70% or greater stenosis in the carotid artery that corresponds to their TIA and stroke symptoms. (Id. at 343-44.) If the stenosis is between 50% and 69%, that is a less definite indication for a carotid endarterectomy, especially in women. (Id.) In 2002, there was no set timeframe for performing a carotid endarterectomy when it was medically indicated. (Id. at 416-17.) The

primary concern in 2002 was that if surgery were performed too early, the carotid endarterectomy might disrupt an unstable plaque and cause more harm. (Id.)

## III. CONCLUSIONS OF LAW

### A. Applicable Standards

Under the FTCA, a plaintiff may recover "for . . . personal injury . . . caused by the negligent . . . act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); see also Molzof v. United States, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law.") Because the alleged malpractice occurred in New York, New York law applies.

Under New York law, to establish a case of medical malpractice, a plaintiff must prove, by a preponderance of the evidence, that a defendant "deviated or departed from acceptable medical practice" – i.e., that he breached a duty of care – and that the breach "was a proximate cause of injury or damage." Postlethwaite v. United Health Servs. Hosps., Inc., 5 A.D.3d 892, 895 (3d Dep't 2004); see also Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994). A physician must exercise "that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices." Nestorowich v. Ricotta, 97 N.Y.2d 393, 398 (2002). Further, "a doctor may be liable only if the doctor's treatment decisions do not reflect his or her own best judgment, or fall short of the generally accepted standard of care." Id. at 399. To prove the standard of care, a plaintiff must present expert medical evidence, unless the malpractice was so obvious that such evidence is

14

unnecessary. Tatta v. State, 19 A.D.3d 817, 818 (3d Dep't 2005); Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 1995).

With respect to proximate cause, a plaintiff must establish that the defendant's breach was not just one factor but a "substantial contributing factor" in causing plaintiff's injury. McDermott v. City of Watertown, 936 F.2d 677, 679 (2d Cir. 1991) (citing Kush v. City of Buffalo, 59 N.Y.2d 26, 32-33 (1983)). Where there are "several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery." Bernstein v. City of New York, 69 N.Y.2d 1020, 1021 (1987) (quotation and citations omitted). A plaintiff "need not prove, however, that the defendant's conduct was the sole cause" of the injuries incurred. McDermott, 936 F.2d at 679.

**B. Application**

Plaintiff failed to establish by a preponderance of the evidence that the VA physicians breached their duty of care to her. There was persuasive expert testimony from both Dr. Doty and Dr. Rosen that hospitalization was not the standard of care for patients with resolved TIAs. (See Tr. 706, 709, 811, 876-888.) This testimony was also supported by the relevant medical literature, which indicated a variation in clinical practice and did not demonstrate any proven benefit of hospitalization. (See id. at 375, 408, 514, 515, 517-19, 591, 614, 695-96, 714-716, 993, 995.)

Plaintiff did have certain recognized risk factors for stroke. (Id. at 39, 48-51, 301, 315, 645, 668-715, 754-67.) Nonetheless, Plaintiff failed to establish that, because she had those risk factors, the VA physicians' decision not to hospitalize her represented a deviation from acceptable medical practice in 2002. Dr. Shields' personal belief that hospitalization was

15

medically required is insufficient to establish the standard of care. (See id. at 513, 518-20, 602-03.) Moreover, Plaintiff did not prove either that most doctors would have admitted a patient with her risk profile or even that doctors were able to make such determinations based on risk factors in 2002. All of the evidence, in fact, was to the contrary. (See id. at 343-45, 348, 355, 375, 762-63.) And Dr. Rosen testified that in 2002, the "overwhelming majority of all neurologists" would not recommend hospital admission for a patient with Plaintiff's risk factors. (Id. at 877.) The VA physicians also explained why they felt it was not necessary to hospitalize Plaintiff based on their medical knowledge and judgment. (Id. at 69-70, 320.)

Plaintiff also argued that the VA physicians' failure to perform a carotid Doppler prevented them from recognizing an additional risk factor – carotid stenosis – that would have further indicated that Plaintiff had high stroke risk and, therefore, needed to be admitted to the hospital. But Plaintiff did not establish that the decision not to perform an inpatient carotid Doppler was a deviation from acceptable medical practice in 2002. Indeed, Defendant's experts provided persuasive testimony to the contrary. (See id. at 687, 689, 693.) And both VA physicians explained why they believed that it was acceptable to wait to perform a carotid Doppler. (Id. at 75, 320, 405, 410.)

Moreover, even if Dr. Schmidt and Dr. McNeal breached the standard of care by not performing a carotid Doppler and by not hospitalizing Plaintiff, Plaintiff has not proven that such a breach proximately caused her injuries. First, there is no evidence that carotid Doppler results on May 22, 2002, would have – or should have – changed the course of Plaintiff's treatment. Dr. McNeal testified that, had she been aware of Plaintiff's May 24, 2002 carotid Doppler results two days earlier, she would have treated Plaintiff in much the same way. (Id. at 343-44.) If

16

anything, the results would have <u>decreased</u> Dr. McNeal's likelihood of recommending hospital admission because Plaintiff did not have a significant stenosis. (Id. at 344-45.)

Plaintiff also failed to prove by a preponderance of the evidence that she would have received TPA had she been admitted to the VA hospital. The first neurological deficit that Plaintiff observed on May 23, 2002, was a brief episode of aphasia in Dr. Agho's office. (Id. at 152-53, 214-18.) She subsequently had several fleeting episodes of symptoms before arriving at NYU. (Id. at 152, 219, 724.) Resolved or rapidly improving neurological deficits are a contraindication for TPA. (Id. at 724, 728, 886, 899.) Thus, Plaintiff has not shown that, more likely than not, there was a point in time at which she was even a candidate for TPA. Accordingly, she has not shown that the VA physicians' decision not to admit her was the proximate cause of her injuries.

Finally, Plaintiff has failed to prove by a preponderance of the evidence that – assuming she was a TPA candidate – the lack of treatment with TPA was a substantial contributing factor to her injuries. Dr. Shields testified that the failure to hospitalize and monitor Plaintiff deprived Plaintiff of receiving TPA and, therefore, deprived her of a 12% absolute chance of avoiding the endarterectomy and her subsequent disabilities. (Id. at 701-05.) Even accepting this as true, all of the medical experts testified that there is no way to predict with certainty how Plaintiff would have responded to TPA. (Id. at 573, 733-34, 886.) There was also a significant chance of more serious injury associated with the drug. (Id. at 651-56.) Plaintiff has not shown that any failure to administer TPA was the proximate cause of her injuries.

In sum, Plaintiff has failed to meet her burden of proving that the VA physicians breached a duty of care or that any breach proximately caused her injuries. Because Plaintiff has not proven malpractice, the court does not reach the question of damages.

## IV. CONCLUSION

For the foregoing reasons, the court finds that Defendant is not liable for medical malpractice. The court orders that Plaintiff take nothing of Defendant, and directs the Clerk of Court to enter judgment in favor of Defendant and close this case.

SO ORDERED.

                                                                       s/Nicholas G. Garaufis

Dated: Brooklyn, New York                             NICHOLAS G. GARAUFIS
November 22, 2010                                          United States District Judge